IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

PUERTO RICO TELEPHONE COMPANY,

    Plaintiff,

v.

PUERTO RICO TELECOMMUNICATIONS
REGULATORY BOARD, *et al.*,

    Defendants.

CIVIL NO. 05-2225 (BJM)

**OPINION AND ORDER**

    This case arises out of an administrative proceeding before a Commonwealth regulatory agency, the Puerto Rico Telecommunications Regulatory Board ("Board"), concerning an interconnection agreement under the Telecommunications Act of 1996 (the "Act"), 47 U.S.C. § 251 *et seq.*, between two telecommunications carriers, Puerto Rico Telephone Company ("PRTC") and Centennial Puerto Rico License Corporation ("Centennial"). PRTC seeks judicial review of the Board's decision ordering PRTC to apply a discounted rate to certain services it provides to Centennial. (Docket No. 1).

    Before the court are PRTC's and the Board's cross-motions for summary judgment (Docket Nos. 85, 87, 88), which they have supported with respective statements of material facts. (Docket Nos. 86, 89). The Board and PRTC opposed each other's motions and fact statements (Docket Nos. 91, 92, 93, 94), and each replied to the other's opposition. (Docket Nos. 99, 100). Upon the parties' consent to proceed before me, the case was referred to me for all further proceedings, including entry of judgment. (Docket Nos. 70, 71). For the reasons explained below, I **grant** summary judgment to the Board and deny PRTC's motion.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

    PRTC is an incumbent local exchange carrier ("ILEC") that provides telecommunications

**Puerto Rico Telephone Company v. Telecommunications Regulatory Board of PR,** *et al.*  Page 2
CIVIL NO. 05-2225 (BJM)
**OPINION AND ORDER**

and related services in Puerto Rico. (Docket Nos. 1, ¶ 8; 89, ¶ 1). Centennial is a competitive local exchange carrier ("CLEC") also doing business in Puerto Rico. (Docket Nos. 1, ¶ 11; 89, ¶ 2). The Board is the Commonwealth agency in charge of regulating telecommunications services in Puerto Rico. (Docket Nos. 1, ¶ 9; 114, ¶ 5). See also 27 L.P.R.A. § 267. On or about July 19, 2002, PRT and Centennial entered into a negotiated interconnection agreement (the "Agreement"), which the Board approved. (Docket Nos. 86, ¶ 1; 89, ¶¶ 3, 4). Section 6.01 of the Agreement provides:

> Any and all Telecommunications Services now or hereafter offered by PRTC on a retail basis to customers that are not Telecommunications Carriers shall be made available by PRTC to [Centennial] for resale under the terms of the Communications Acts, the FCC rules (including the limitations set forth in 47 CFR § 51.605), and the Board Rules, and this Agreement as [sic] such time and in those locations as they are offered by PRTC on a retail basis to customers. . . .

(Docket Nos. 86, ¶ 2; 89, ¶ 5; 89-1, p. 4). This term was privately negotiated by the parties. (Docket No. 89, ¶ 6).

PRTC offers T-1 circuits[1] (sometimes referred to as Digital Service 1 or DS1 circuits) via its access tariffs, and not via its end-user tariffs. PRTC's access tariffs are principally designed for telecommunications carriers. Although end users are not prohibited from purchasing services offered on the access tariffs, end users who do so tend to be large, sophisticated telecommunications users. Centennial sought to purchase high-capacity T-1 circuits offered in PRTC's access tariffs at a wholesale discount off the listed price. PRTC agreed to provide the T-1 circuits sought by Centennial, but refused to apply the requested discount. (Docket No. 86, ¶¶ 3-5; 89, ¶ 8).

Centennial filed an administrative complaint with the Board in May 2003, alleging that PRTC had breached the Agreement.[2] (Docket Nos. 86, ¶ 6; 89, ¶ 7). PRTC and Centennial agreed that their dispute "was strictly a legal issue which they had agreed to submit to the Board for

---

[1] A T-1 circuit is "[a] digital transmission link with a total signaling speed of 1.544 Mbps (1,544,000 bits per second), which may be divided into up to 24 separate voice-quality channels, or which may be utilized as a single two-way high speed data stream." Comcation, Inc. v. United States, 78 Fed. Cl. 61, 62 n.3 (Fed. Cl. 2007) (quotation omitted).

[2] Centennial also filed a supplemental complaint in September 2003. (Docket No. 86, p. 5).

**Puerto Rico Telephone Company v. Telecommunications Regulatory Board of PR,** *et al.*     Page 3
CIVIL NO. 05-2225 (BJM)
**OPINION AND ORDER**

decision," namely (in the Board's words) whether "high capacity retail circuits [*i.e.*, T-1 circuits] qualify for the wholesale discount established in the Interconnection Agreement." (Docket Nos. 86, p. 5; 89, ¶ 10). In the administrative proceeding, PRTC argued that the Federal Communications Commission ("FCC") explicitly excluded so-called "special access services" from the ambit of the Act's wholesale rate resale requirement, and that the T-1 circuits fell within that class of services not subject to the wholesale discount. (Docket Nos. 94, ¶ 6; 94-2, p. 3). The parties filed a joint stipulation of facts with the Board, submitted memoranda of law, appeared for oral argument, and subsequently responded to additional questions posed by the Board. (Docket No. 89, ¶¶ 11-13).

In its administrative Resolution and Order of April 8, 2005 ("Order"), the Board adopted the parties' stipulations in its findings of fact[3] and made a further finding of fact that "PRTC has refused to provide said [T-1] circuits to Centennial at a wholesale discount." (Docket Nos. 86, ¶ 7, p. 7; 89, ¶ 29). In the Order, the Board noted that Section 6.01 of the Agreement contained the language critical to the dispute, which the Board said was controlled by the FCC's limitations on the wholesale discount in 47 C.F.R. § 51.605 ("Section 51.605"), on whose "scope and interpretation" the matter turns. (Docket No. 86, p. 7, 8; 89, ¶¶ 15, 16; 89-1, p. 4). The Board noted that the limitation's "crux . . . centers upon the interplay of two definitions: **'exchange access services'** and **'access services'**," and that the parties' disagreement, in turn, centered on the applicable scope of the limitation, which the parties agreed is controlling. (Docket No. 86, p. 8-9) (emphasis in original).

After quoting the language of Section 51.605,[4] which "is clearly identified in the

---

[3] The Board found, in pertinent part, that "Centennial seeks to purchase PRT[C] T-1 circuits to connect end user premises to Centennial locations in order to resell those circuits to its end users"; that "[t]he wholesale discount for applicable business services is 25%[] of the tariffed retail price as agreed upon in the Interconnection Agreement"; that "PRT[C] offers T-1 circuits to end users"; and that "PRTC's offer of T-1 circuits is made in accordance with the terms and conditions of PRTC's . . . access tariffs." (Docket Nos. 86, p. 7; 89, ¶¶ 14, 29; 94, ¶ 7; 94-1, p. 2, ¶¶ 5, 8, 9).

[4] The regulation provides,
(a) An incumbent LEC shall offer to any requesting telecommunications carrier any telecommunications service that the incumbent LEC offers on a retail basis to subscribers that are not telecommunications carriers for resale at wholesale rates that are,

**Puerto Rico Telephone Company v. Telecommunications Regulatory Board of PR,** *et al.*     Page 4
CIVIL NO. 05-2225 (BJM)
**OPINION AND ORDER**

Interconnection Agreement as limiting the application of the wholesale discount," the Board held that "[t]he dispute between the parties lies in the application of subpart (b) of the FCC rule," which "clearly excludes" the discount's "use for exchange access services." (Dockets No. 86, p. 9; 89, ¶¶ 17-18). The Board explained that since the statutory purpose of "exchange access"[5] is "the origination or termination of telephone toll service," then, "[a]s a consequence, origination and termination of any toll service[] is expressly excluded from the resale obligation." (Docket Nos. 86, p. 10; 89, ¶ 19).

According to the Order, Centennial contended that "it does not anticipate providing exchange access service to end users with said [T-1] circuits, even when it admits some toll [*i.e.*, exchange access] service will likely flow over these circuits." The Board further noted that "[w]hile Centennial expresses it does not intend for the circuits to be used primarily for exchange access

---

    at the election of the state commission--
    (1) Consistent with the avoided cost methodology described in §§ 51.607 and 51.609; or
    (2) Interim wholesale rates, pursuant to § 51.611.
    (b) For purposes of this subpart, exchange access services, as defined in section 3 of the Act [47 U.S.C. § 153], shall not be considered to be telecommunications services that incumbent LECs must make available for resale at wholesale rates to requesting telecommunications carriers.
    (c) For purposes of this subpart, advanced telecommunications services sold to Internet Service Providers as an input component to the Internet Service Providers' retail Internet service offering shall not be considered to be telecommunications services offered on a retail basis that incumbent LECs must make available for resale at wholesale rates to requesting telecommunications carriers.
    (d) Notwithstanding paragraph (b) of this section, advanced telecommunications services that are classified as exchange access services are subject to the obligations of paragraph (a) of this section if such services are sold on a retail basis to residential and business end-users that are not telecommunications carriers.
    (e) Except as provided in § 51.613, an incumbent LEC shall not impose restrictions on the resale by a requesting carrier of telecommunications services offered by the incumbent LEC.

47 C.F.R. § 51.605.

    [5] "The term 'exchange access' means the offering of access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services." 47 U.S.C. § 153(20).

**Puerto Rico Telephone Company v. Telecommunications Regulatory Board of PR,** *et al.*    Page 5
CIVIL NO. 05-2225 (BJM)
**OPINION AND ORDER**

service, PRTC emphasizes that there is no indication of any prohibition for Centennial's customers to use these circuits solely for exchange access service." (Docket No. 86, p. 10; 89, ¶ 21).

The Board then addressed PRTC's argument that "there is no particular class of access services – exchange access or not – that can be fairly characterized as an end-user retail offering," and Centennial's counter-argument that specific classes of access services can be so characterized.[6] (Docket No. 86, p. 10). The Board also noted PRTC's argument "that its access services are sold primarily to carriers" and Centennial's counter-argument that the FCC classifies "end-user connections to the Internet" as "'access services' in the broadest sense of the term," and that "there are uses of access service – not classified as 'exchange access' – that are sold to end-user customers." (Id.). The Board concluded that since "PRTC offers high-capacity circuits to end-user customers," "under the parties' Interconnection Agreement it follows [that] high-capacity circuits **may be** eligible for the wholesale discount as long as they are not used for the provision of exchange access." (Docket No. 86, p. 11) (emphasis in original).

Given that determination, the Board found it necessary to address "whether a mixed-use of the circuit [*i.e.*, for both exchange access and non-exchange access services] disqualifies the entire circuit offered on a retail basis that would otherwise be eligible for a wholesale discount," and concluded that it does not. (Docket No. 86, p. 11). The Board noted that neither the FCC nor the Interconnection Agreement addressed the matter, and rejected both Centennial's and PRTC's arguments. (Docket Nos. 86, p. 11; 89, ¶¶ 22-24). Instead, absent any guidance or controlling authority, the Board analogized to what it alleged is the industry custom of determining a circuit's

---

[6] Specifically, according to the Board, Centennial argued that "what had previously been identified as 'private lines' – retail sales of direct communications channels linking points of the customer's choice – were folded into the now catch-all category of 'special access' service. The service formerly known as *'special access'* does not meet the Act's definition of 'exchange access'." (Docket No. 86, p. 10) (emphasis added). This quotation misquotes Centennial's response to the Board's supplemental data request, which states, "The service formerly known as *'private lines'* does not meet the Act's definition of 'exchange access.' The service formerly known as 'special access' does." (Docket No. 85, p. 39) (emphasis added).

**Puerto Rico Telephone Company v. Telecommunications Regulatory Board of PR,** *et al.*    Page 6
CIVIL NO. 05-2225 (BJM)
**OPINION AND ORDER**

jurisdiction based on its percent interstate use ("PIU") factor. The Board determined "that in order to make a mixed circuit eligible for the wholesale discount, Centennial must . . . declare the percent of **each circuit** that is used for exchange access. Said portion of the circuit will not be eligible for the wholesale discount pursuant to the terms of the Interconnection Agreement." (Docket No. 86, p. 11; 89, ¶¶ 25-26) (emphasis in original).

The Board stated that its decision "is a fair resolution of the dispute surrounding the Interconnection Agreement. It is consistent with the language in the Agreement and applies the FCC limitation to the situation where mixed use high-capacity circuits are offered to and used by retail customers." (Docket Nos. 86, p. 12; 89, ¶ 27).

The Board's Order granted Centennial "a wholesale discount to the portion of high-capacity circuits from PRTC that are not to be used for exchange access" and ordered PRTC to "apply the wholesale discount for the portion of the circuit not engaged in exchange access," subject to a qualifying declaration by Centennial of "the percentage of each circuit that is used for exchange access service." (Docket No. 86, p. 12). PRTC filed the instant complaint appealing from the Board's decision on November 28, 2005, alleging that the Board's Order is contrary to and preempted by the Act and the FCC's implementing regulations, and seeking declaratory and injunctive relief against the Board. (Docket Nos. 1; 89, ¶ 28).

**DISCUSSION**

**I.    Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law". Fed. R. Civ. P. 56(c). A fact is material only if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining if a material fact is "genuine", the court does not weigh the facts but instead ascertains whether the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; Leary

Case 3:05-cv-02225-BJM   Document 101   Filed 03/30/11   Page 7 of 19

**Puerto Rico Telephone Company v. Telecommunications Regulatory Board of PR**, *et al.*   Page 7
CIVIL NO. 05-2225 (BJM)
**OPINION AND ORDER**

v. Dalton, 58 F.3d 748, 751 (1st Cir. 1995).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [evidence] . . . which it believes demonstrate the absence of a genuine issue of material fact." Crawford-El v. Britton, 523 U.S. 574, 600 n.22 (1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Once this threshold is met, the burden shifts to the nonmoving party. The nonmovant may not rest on mere conclusory allegations or wholesale denials. Fed. R. Civ. P. 56(e). Further, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Of course, the court draws inferences and evaluates facts "in the light most favorable to the nonmoving party." Leary, 58 F.3d at 751.

Summary judgment is particularly appropriate for this administrative appeal on a closed administrative record. Courts have concluded that in disputes related to interconnection agreements under the Act, "the record created by the state utility commission is closed for the purposes of review." Bell Atl.-Del., Inc. v. Global NAPS S., Inc., 77 F. Supp. 2d 492, 502 (D. Del. 1999); see also MCI Telecomms. Corp. v. N.Y. Tel. Co., 134 F. Supp. 2d 490, 500 (N.D.N.Y. 2001) ("this Court agrees that it is limited to the record created by the state utility commission when reviewing disputes related to interconnection agreements issued under the Act"); MCI Telecomms. Corp. v. Ohio Bell Tel. Co., 279 F. Supp. 2d 947, 954 (S.D. Ohio 2003) ("[u]nder the provisions set forth in the Act for judicial review, it is most inappropriate for a district court to review matters which have not been fully presented to the Commissioners").

**II.   Standard of Review**

State agency determinations resting principally on an interpretation of federal law are subject to *de novo* review by federal courts, and are not accorded the deference reserved for reviews of federal agencies interpreting their own rules and regulations. Global NAPs, Inc. v. Verizon New Eng., Inc., 444 F.3d 59 (1st Cir. 2006) (hereafter Global NAPs I). Where no error of law exists, the

**Puerto Rico Telephone Company v. Telecommunications Regulatory Board of PR,** *et al.*    Page 8
CIVIL NO. 05-2225 (BJM)
**OPINION AND ORDER**

state agency's determinations as to matters of fact, policy, and application of general standards are reviewed under the arbitrary and capricious standard. Centennial P.R. License Corp. v. Telecomms. Regulatory Bd. of P.R., ___ F.3d ___, 2011 WL 381610, at *6 (1st Cir. Feb. 7, 2011) (citations and quotations omitted). Furthermore, a state agency's construction of an interconnection agreement that was filed with it is entitled to "some deference." Global NAPs, Inc. v. Verizon New Eng., Inc., 505 F.3d 43, 47 (1st Cir. 2007) (hereafter Global NAPs II) (citing Bos. Edison Co. v. Fed. Energy Regulatory Comm'n, 441 F.3d 10, 12-13 (1st Cir. 2006)). "In other words, the agency's interpretation must be reasonable, but at the very least close calls tend to go its way." Bos. Edison Co., 441 F.3d at 13 (citations omitted). "The rationale for deference is that interpreting a carrier tariff or filed agreement is often informed by the agency's intertwined policy judgments and expertise." Global NAPs II, 505 F.3d at 47 (citations omitted).

## III. Analysis

Section 251(c)(4) of the Act requires an ILEC "to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers." 47 U.S.C. § 251(c)(4)(A). In the words of Section 51.605, the FCC's implementing regulation, the ILEC's duty is to "offer to any requesting telecommunications carrier any telecommunications service that the incumbent LEC offers on a retail basis to subscribers that are not telecommunications carriers for resale at wholesale rates" that are in keeping with the regulations. 47 C.F.R. § 51.605(a). The "wholesale rate" is the "retail rate[] charged to subscribers for the telecommunications service requested, excluding the portion thereof attributable to any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier," known as "avoided retail costs." 47 U.S.C. § 252(d)(3); 47 C.F.R. §§ 51.607, 51.609. However, services known as "exchange access services" are not subject to the wholesale rate requirement. 47 C.F.R. § 51.605(b).

The parties have agreed that there are no disputed issues of material fact, rendering this case appropriate for summary disposition as a matter of law. (Docket No. 69, p. 2). The central question

**Puerto Rico Telephone Company v. Telecommunications Regulatory Board of PR,** *et al.*  Page 9
CIVIL NO. 05-2225 (BJM)
**OPINION AND ORDER**

before the court is whether, in light of its interpretation of the Agreement (to which the court gives deference), the Board correctly interpreted relevant provisions of the Act and Section 51.605 in applying the wholesale discount *pro rata* to the T-1 circuits offered by PRTC. PRTC argues that T-1 circuits are legally exempt from the wholesale discount requirement because they qualify as "special access services," which, according to PRTC, the FCC has deemed count as "exchange access services," which indisputably are not subject to the discount. PRTC argues that under FCC regulations, all access services are exempted from the wholesale discount requirement regardless of how they are used and whether non-carrier end users are allowed to purchase them. (Docket No. 85). The Board, arguing for arbitrary and capricious review, contends that in the absence of controlling precedent, it acted within its authority by following the Agreement, the Act, and FCC policy in crafting a solution to the novel issue of the wholesale discount's application to a "mixed-use" circuit. (Docket No. 88).

Before determining whether the Board reached the correct result on the "mixed-use" circuit question, the court must first review the Board's preliminary determination that the wholesale discount may apply to the T-1 circuits at all. While the Board found that PRTC offers the T-1 circuits out of its access tariffs, it also found that "PRTC offers high-capacity circuits to end-user customers." (Docket No. 86, p. 7, 11). The Board therefore concluded that "[c]onsequently, under the parties' Interconnection Agreement, it follows [that] high-capacity circuits **may be** eligible for the wholesale discount as long as they are not used for the provision of exchange access." (Id., p. 11) (emphasis in original). This conclusion rests on two premises: first, that offering high-capacity circuits to end-user customers means the T-1 circuit is a "circuit offered on a retail basis" (id.); second, that the "retail" qualification renders insignificant the circuit's listing in PRTC's access tariffs (and its corresponding rate). The court agrees with the Board as to the first premise, and defers to its determination as to the second.

A.  **Whether PRTC Offers T-1 Circuits "on a Retail Basis"**

The Board's Order characterizes the T-1 circuits at issue as "high-capacity retail circuits."

**Puerto Rico Telephone Company v. Telecommunications Regulatory Board of PR, *et al.***     Page 10
CIVIL NO. 05-2225 (BJM)
**OPINION AND ORDER**

(Docket No. 86, p. 10). PRTC contends that the Board erred in classifying the T-1 circuits as an end-user retail offering because PRTC has never provided T-1 circuits at retail. (Docket Nos. 85, p. 13-14; 93, p. 7-10). The Board argues that "PRTC admittedly sells [T-1 circuits] to retail customers," so "T-1 service is within the ambit of the interconnection agreement." (Docket No. 88, p. 14, 15).

      The parties differ over the meaning of the term "retail." The Board's position rests on the buyer of the circuits (end users); PRTC's, on the tariff and rate.[7] It is crucial to this court's scope of review, then, to determine whether the Board was interpreting the term "retail" in the context of the Agreement[8] or in the context of the Act and FCC regulations – *i.e.*, as a matter of contractual construction or of statutory construction. The Board stated that "the matter turns on the scope and interpretation of the FCC's limitation on the wholesale discount [in Section 51.605], which is controlling in the resolution of this dispute." (Docket No. 86, p. 8). Furthermore, the Board rejected PRTC's argument concerning the statutory definition of "exchange access," namely, "that there is no particular class of access services – exchange access or not – that can be fairly characterized as an end-user retail offering," and instead agreed with Centennial's position that "there are specific classes of access services that are end-user retail offerings" under the Act's definitions. (Docket No. 86, p. 10; see Docket No. 85, p. 38). Accordingly, it is evident that the Board was interpreting the term "on a retail basis" as used in Section 51.605, not as used in the Agreement. The court must therefore review *de novo* whether PRTC's sale of T-1 circuits to end users from its access tariffs constitutes an offering "on a retail basis" under Section 51.605.

      The FCC amended Section 51.605 in 2000 by changing subsection (b) and adding subsections (c) through (e) pursuant to a 1999 order in which the FCC determined the proper interpretation and application of the term "at retail" in Section 251(c)(4). Notice of Final Rule, 65 Fed. Reg. 6915 (Feb. 11, 2000); In the Matters of Deployment of Wireline Servs. Offering Advanced

---

[7] The Board's supplemental questions to Centennial and PRTC assumed that telecommunications services can be sold "at retail" despite being listed in PRTC's access tariffs. (See Docket No. 85, p. 37).

[8] There is no indication that the Agreement defines its use of "retail."

| | |
|---|---|
| **Puerto Rico Telephone Company v. Telecommunications Regulatory Board of PR,** *et al.*<br>CIVIL NO. 05-2225 (BJM)<br>**OPINION AND ORDER** | Page 11 |

Telecomms. Capability, F.C.C. 99-330, 1999 WL 1016337, app. B (F.C.C. Nov. 9, 1999) (hereafter Advanced Services Resale Order). In that order, the FCC was called upon to determine "whether advanced services [namely, digital subscriber line, or 'DSL,' service] sold to Internet Service Providers ['ISPs'] pursuant to volume and term discount plans are subject to" Section 251(c)(4)'s wholesale discount requirement. Id., ¶ 10. Noting that "[t]he Act does not define the term 'at retail'" in Section 251(c)(4), the FCC used "the traditional tools of statutory construction" "to determine a reasonable interpretation in this context." Id., ¶¶ 11-12.

In its analysis, the FCC noted "that retail transactions necessarily involve direct sales of a product or service to the ultimate consumer for her own personal use or consumption." Id., ¶ 13. Accordingly, the FCC "carefully analyze[d] the nature of the sale to determine whether or not the service is provided to a particular group of customers 'at retail.'" Id., ¶ 14. The FCC interpreted the term "at retail" "to mean a sale to an ultimate consumer." It distinguished sales to "residential and business end-users" who "buy the DSL service to meet their own internal telecommunications needs" from sales of DSL service to ISPs,[9] which bundle the telecommunications service with their own information services into a package for sale to the ultimate end-user. Id., ¶¶ 14, 16, 17. The FCC concluded "that while an [ILEC] DSL offering to residential and business end-users is clearly a retail offering designed for and sold to the ultimate end-user, an [ILEC] offering of DSL services to [ISPs] as an input component to the [ISP's] high-speed Internet service offering is not a retail offering." Therefore, "DSL services designed for and sold to residential and business end-users are subject to the discounted resale obligations of section 251(c)(4)," but offerings to ISPs to recombine DSL service with the latter's own Internet service are not. Id., ¶ 19. The amendments to Section 51.605 codify these holdings. See 47 C.F.R. § 51.605(b)-(e).

In light of the FCC's definition of "at retail" as used in Section 251(c)(4) to mean "a sale to an ultimate consumer," the court finds that the Board correctly applied Section 51.605's term "on

---

[9] The FCC excludes ISPs from the category of "telecommunications carriers." Advanced Services Resale Order, 1999 WL 1016337, ¶ 20.

**Puerto Rico Telephone Company v. Telecommunications Regulatory Board of PR,** *et al.*  Page 12
CIVIL NO. 05-2225 (BJM)
**OPINION AND ORDER**

a retail basis" to refer to direct end-user sales of T-1 circuits.  While the <u>Advanced Services Resale Order</u> was specific to the context of DSL service, the FCC's definition applies with equal force to the instant circumstances, particularly since its analysis led to the amendment of Section 51.605, which the Board stated controls the instant matter.  The Board's decision was based on the fact that PRTC sells T-1 circuits directly to end users, who "tend to be large sophisticated telecommunications users."[10]  (Docket No. 86, p. 7, n.9).  Like the business and residential DSL service customers cited by the FCC, PRTC's end user customers buy T-1 circuits for their own telecommunications needs.  The Board's use of the term "retail" is in accord with the FCC's focus on the direct nature of the sale.  Accordingly, the Board did not err in determining that T-1 circuit sales to end users are "retail" offerings under Section 51.605.

>     B.    **"Retail" Offerings Made Through Access Tariffs**

Next, PRTC argues that the fact that it offers the T-1 circuits from its access tariffs, not its end-user tariffs, precludes the application of the wholesale discount to the T-1 circuits.  PRTC argues that the Agreement does not establish an applicable resale discount for T-1 circuits and alleges that because the T-1 circuits are offered from the access tariffs, the circuits "are already tariffed at wholesale rates."  Therefore, PRTC argues, applying the wholesale discount to the T-1 circuits as ordered by the Board would provide a "double discount" to Centennial, going beyond what the Act requires and placing PRTC at a competitive disadvantage. (Docket Nos. 85, p. 13-14; 93, p. 7-10).

Having determined correctly (as discussed above) that PRTC offers T-1 circuits "at retail" to end users, the Board then determined that "*under the parties' Interconnection Agreement* it follows high-capacity circuits **may be** eligible for the wholesale discount as long as they are not used for the provision of exchange access." (Docket No. 86, p. 11) (emphasis on "may be" in original;

---

[10] In the instant context, there is apparently no non-carrier analogue to the ISPs in the DSL context addressed by the FCC.  The Board's Order does not distinguish among classes of non-carrier end users, nor has PRTC suggested such an analogue.

other emphasis added). Under the deferential standard of review applicable at this stage of the court's analysis, the court will not disturb the Board's interpretation that the Agreement calls for the imposition of the wholesale discount on the eligible portion of the T-1 circuits despite the fact that such circuits are listed in PRTC's access tariffs, not its end-user tariffs.

The Board's conclusion involves two portions of the Agreement: the provision regarding the applicability of the discount to services offered at retail, and the provision concerning the wholesale discount itself. The former provision, Section 6.01, states that telecommunications services "offered by PRTC on a retail basis" to non-carrier customers will be offered to Centennial for resale "under the terms of the Communications Acts, the FCC rules (including the limitations set forth in 47 CFR § 51.605), and the Board Rules, and this Agreement." The other provision is the subject of a finding of fact by the Board that "[t]he wholesale discount for applicable business services is 25% of the tariff *retail* price as[] provided in the Interconnection Agreement." (Docket No. 86, p. 7) (emphasis added).

The court has already concluded that the Board correctly used the legal term "retail" to refer to direct sales to end users. Therefore, read consistent with that definition, the Order found that the Agreement provides for a wholesale discount of 25% of the price at which a tariffed service is sold directly to a non-carrier end user. Under Section 6.01, the Board held that since the T-1 circuits are sold to end users, the T-1 circuits could be eligible for this 25% discount. (Docket No. 86, p. 11). The court defers to the Board's findings of fact regarding the Agreement and its interpretation of the Agreement's provisions. Centennial P.R. License Corp., 2011 WL 381610, at *6; Global NAPs II, 505 F.3d at 47.

PRTC argues that the access tariff rate is already a wholesale rate. (Docket No. 93, p. 8). The Order recognizes that the price at which PRTC offers T-1 circuits to end users is the access tariff rate. (Docket No. 86, p. 7). However, the Board's Order never made a finding that the access tariff rate is a "wholesale" rate. As the Board notes (Docket No. 91, p. 6-7), the record is not open for

PRTC to bring in that argument at this juncture.  See Bell Atl.-Del., Inc., 77 F. Supp. 2d at 502.  The definition of "wholesale rate" is a legal question, not a matter of common English usage; under the Act and Section 51.605, the "wholesale rate" requires extensive findings by the state agency.  See 47 C.F.R. §§ 51.605, 51.607, 51.609, 51.611.  This court cannot simply accept PRTC's allegation that its access tariff rate is "wholesale" and deem that rate legally sufficient, bypassing consideration of the issue by the Board.  Although the Board asked Centennial and PRTC whether "it make[s] a difference whether the services sold at retail are listed in PRTC's exchange access tariff,"[11] the Order does not indicate that the Board considered, much less determined, whether the prices in that tariff constitute "wholesale rates" within the meaning of the applicable regulations.  (Docket No. 85, p. 37).  "[I]t is most inappropriate for a district court to review matters which have not been fully presented to" the Board.  MCI Telecomms. Corp., 279 F. Supp. 2d at 954.  The court therefore will not evaluate PRTC's argument that it sells T-1 circuits at "wholesale rates."  Whether the access tariff rates are "wholesale rates" that, if discounted, would allow Centennial to "double dip," as PRTC argues (Docket No. 85, p. 20-22), is simply not a question open to the court to resolve on review of a closed administrative record.

        C.        **Whether PRTC's T-1 Circuits Are Exempt from the Wholesale Discount**

Next, PRTC argues that the T-1 circuits are categorically exempt from the wholesale rate requirement set forth in the Act and Section 51.605.  The court reviews *de novo* the Board's conclusion on this issue of federal law that the T-1 circuits are subject to the wholesale discount.

Section 51.605 requires that in offering services to a CLEC for resale, an ILEC must apply the wholesale rate to services it provides at retail to non-carrier subscribers, except for exchange access services.  47 U.S.C. § 251(c)(4); 47 C.F.R. § 51.605(a)-(b).  In addition, the FCC has ruled that special access services are not subject to Section 251(c)(4)'s resale requirement.  In the Matter of Unbundled Access to Network Elements, 20 FCC Rcd. 2533, 2563, ¶ 51 n.146 (F.C.C. Feb. 4,

---

[11] PRTC's response is not in the record before the court.

**Puerto Rico Telephone Company v. Telecommunications Regulatory Board of PR**, *et al.*  Page 15
CIVIL NO. 05-2225 (BJM)
**OPINION AND ORDER**

2005) (hereafter Second Unbundling Remand Order) (citing In the Matter of Implementation of the Local Competition Provisions in the Telecomms. Act of 1996, 11 FCC Rcd. 15499, 15934, ¶ 873 (F.C.C. Aug. 8, 1996) (hereafter Local Competition Order)).[12]

      PRTC argues that T-1 circuits are exempt from the wholesale rate requirement because T-1 circuits are special access services, all special access services are exchange access services, and furthermore, all access services are exempt from the wholesale rate requirement, no matter how they are used or whether non-carrier end users may purchase them. (Docket No. 85, p. 9-11). The Board acknowledges that special access services are exempt from the resale requirement, but argues that this does not mean, as PRTC assumes, that "entire types of circuits are off-limits for resale, regardless of the service provided, just because that type of circuit is used in part to provide special access services." That is, the Board contests PRTC's equating of a T-1 circuit with one type of service for which it may be used. (Docket No. 88, p. 12-13). The Board stresses that the FCC has not addressed the issue of circuits that are "mixed use," that is, used to provide both discount-exempt services and other services that do qualify for the wholesale discount. The Board also challenges PRTC's equating of special access services with exchange access services and PRTC's assertion that all access services are exempt from the wholesale discount requirement. (Docket No. 91, p. 5-11).

      The FCC itself has stated that T-1 service falls under Section 251(c)(4)'s wholesale rate requirement. The Advanced Services Resale Order specifically notes, "Incumbent LECs are still under a statutory obligation to provide any telecommunications services, including DSL, *T-1*, DS-3, and business exchange services, sold at retail to subscribers who are not telecommunications carriers to requesting carriers at wholesale rates." Advanced Services Resale Order, 1999 WL 1016337, ¶ 19, n.41 (citing 47 U.S.C. § 251(c)(4)) (emphasis added). Furthermore, the FCC has repeatedly distinguished T-1 circuits (also known as DS1 circuits) from special access services. E.g., Second

---

[12] The court notes that the Local Competition Order predates the Advanced Services Resale Order, in which the FCC "determine[d] the proper interpretation and application of the term 'at retail'" in Section 251(c)(4) for the first time. Advanced Services Resale Order, 1999 WL 1016337, ¶ 10.

Unbundling Remand Order, 20 FCC Rcd. at 2709, ¶ 64, n.176 (noting that DS1 circuits can be purchased as unbundled network elements or as "special access circuits"); In the Matter of Fed.-State Joint Bd. on Universal Serv.; Forward-Looking Mechanism for High Cost Support for Non-Rural LECs, 14 FCC Rcd. 20156, 20202, ¶ 99 (F.C.C. Nov. 2, 1999), *aff'd*, Qwest Corp. v. Fed. Commc'ns Comm'n, 258 F.3d 1191 (10th Cir. 2001) (hereafter Inputs Order) (distinguishing "switched business traffic carried on DS1 circuits" from "special access lines carried on DS1 circuits").

Both parties cite an agency adjudication in which the Ohio Public Utilities Commission ("PUC") stated that "the FCC expressly concluded that special access services, like T1 services, are not subject to the resale discount requirement." Ohiotelnet.com, Inc. v. ALLTEL Ohio, Inc., 2005 Ohio PUC LEXIS 48, at *10-*11 (Ohio Pub. Utils. Comm'n Feb. 2, 2005) (citing Local Competition Order, 11 FCC Rcd. at 15934, ¶ 873). While the FCC does indeed deem special access services exempt from the discount requirement, it was the PUC itself that characterized T-1 services as special access services. Paragraph 873 of the Local Competition Order, cited by the PUC, does not state that T-1 services are special access services, and the PUC cites no authority for its statement that they are. Given the FCC authority cited *supra*, the court is not persuaded by the Ohio PUC case.

The court therefore rejects PRTC's invitation to equate T-1 circuits with either exchange access services (see Docket No. 93, p. 5) or special access services. (See id., p. 6). The Board did not err in refusing to do so either.[13] The court holds that the Board correctly concluded that,

---

[13] While the Board distinguished the T-1 circuits at issue from the services for which it found they will be used, it did not make any holding that, as a matter of law, "special access services" are "exchange access services." The court need not reach this question either, despite PRTC's extensive arguments on this point, as it is not necessary to a resolution of the dispute in light of the court's determination that T-1 circuits are not equal to either kind of service. Furthermore, given this determination and the court's conclusion *supra* that PRTC sells T-1 circuits "at retail," the court is not persuaded by PRTC's argument that the Board's Order is preempted by federal law because the Order ignores the "at retail" requirement and the FCC's exclusion of special access services from the wholesale rate requirement. (Docket No. 85, p. 17-20).

**Puerto Rico Telephone Company v. Telecommunications Regulatory Board of PR,** *et al.*    Page 17
CIVIL NO. 05-2225 (BJM)
**OPINION AND ORDER**

depending on their manner of use, T-1 circuits may be subject to the wholesale discount pursuant to Section 251(c)(4) and Section 51.605.

      **D.**    **The Board's Partial Discount Solution for "Mixed-Use" Circuits**

      What remains for the court to evaluate, then, is the Board's actual order to PRTC: to apply the wholesale discount to the T-1 circuits PRTC sells Centennial, but on a pro-rated basis in light of the "mixed use" Centennial will make of the circuits. The Board found no guidance from the FCC or the Agreement on the "mixed use" question, and thus crafted its own solution.

      The court will not disturb the Board's determination that Centennial plans to use the T-1 circuits mostly to connect end users to the Internet and partially for exchange access service. The Board's findings of fact may be overturned only if they are arbitrary or capricious. Centennial P.R. License Corp., 2011 WL 381610, at *6. Under this standard, "an agency's decision will be upheld unless the agency lacks a rational basis for making the determination or if the decision was not based on consideration of the relevant factors." Id. at *16 (citation and quotation omitted). Here, the Board pointed to the record, namely Centennial's responses to the Board's supplemental data request, in finding that Centennial "desires to use the circuits from an end-user point to a Centennial point," that Centennial "contends . . . it does not anticipate providing exchange access service to end users with said circuits, even when it admits some toll service will likely flow over these circuits," and that Centennial's request for the circuits "is directed more at Internet usage rather than interstate exchange access usage." (Docket No. 86, p. 10, 11 n.29). Since the Board based its determination on the record before it, the court upholds its factual findings about Centennial's intended use of the T-1 circuits. Furthermore, the court defers to the Board's reading that the Agreement does not cover "the matter of mixed-use circuits" (id., p. 11), particularly since PRTC does not dispute this interpretation of the Agreement. Global NAPs II, 505 F.3d at 47.

      Given these facts, the Board was faced with two seemingly conflicting directives from Congress and the FCC: to apply the wholesale discount to the T-1 circuits because PRTC sells them

**Puerto Rico Telephone Company v. Telecommunications Regulatory Board of PR,** *et al.*     Page 18
CIVIL NO. 05-2225 (BJM)
**OPINION AND ORDER**

at retail to non-carrier end users, but *not* to apply the discount to exchange access service, for which the T-1 circuits would in part be used. Finding no precedent from the FCC addressing how Section 51.605(b)'s exchange access limitation applies in the context of a "mixed use" of high-capacity circuits, the Board decided to apply the wholesale discount specified in the Agreement, reduced by the percentage of each T-1 circuit that is used for exchange access (which percentage Centennial must declare). (Docket No. 86, p. 11-12).

The arbitrary and capricious standard also applies to the Board's solution, since, as described above, the Board did not err in its application of the Act and Section 51.605. Centennial P.R. License Corp., 2011 WL 381610, at *6 ("where no error of law exists, the state agency's other determinations are reviewed under the arbitrary and capricious standard") (citation and quotation omitted). The Order adequately explains why the Board decided to pro-rate the discount applicable to the T-1 circuits. The Board states that it reached its solution to the novel problem presented on the basis of a "thorough review of the complete record," including careful examination of the Agreement's language, oral arguments from PRTC and Centennial, and the parties' extensive responses to the Board's supplemental questions (the Order cites both PRTC's and Centennial's responses). (Docket No. 86, p. 5-12). Those questions addressed factors relevant to the Board's decision, including the tariffs from which PRTC offers the T-1 circuits, Centennial's intended use of the circuits, the language of Section 6.01 of the Agreement, the evolution of the telecommunications market and regulatory landscape over time, and FCC policy. (Docket No. 85, p. 35-50). Furthermore, in the absence of on-point guidance, the Board considered both parties' arguments for how to apply the wholesale discount to a "mixed use" circuit and ultimately drew on industry custom it considered analogous to reach its "percentage used for exchange access" solution.[14] (Docket No. 86, p. 11). The court concludes that the Board's decision was not arbitrary

---

[14] The court agrees with the Board (Docket No. 100) that, contrary to PRTC's argument (Docket No. 93, p. 6-7), FCC rules for determining a circuit's jurisdiction (interstate or intrastate) are not dispositive of the separate issue of the application of the wholesale rate requirement to a high-capacity

**Puerto Rico Telephone Company v. Telecommunications Regulatory Board of PR,** *et al.*   Page 19
CIVIL NO. 05-2225 (BJM)
**OPINION AND ORDER**

or capricious. Since the Board proffered a rational basis for its decision, the court upholds the Order.

## CONCLUSION

In light of the above, the Board's motion for summary judgment (Docket No. 87) is **GRANTED** and PRTC's (Docket No. 85) is **DENIED**. Judgment to be entered accordingly.

**IT IS SO ORDERED**.

At San Juan, Puerto Rico, on this 30th day of March, 2011.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge

---

circuit used partly for exchange access services and partly for non-exchange access services. The Board's Order noted that there is no directly on-point FCC authority on that issue, PRTC did not submit any, and the court can find none.